AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of Columbia

In the Matter of the Search of

*(Briefly describe the property to be sear or identify the person by name and address)*

INFORMATION ASSOCIATED WITH A SERVER HELD BY AN INTERNET SERVICE PROVIDER PURSUANT TO 18 U.S.C. § 2703

Case No. 26-sc-1760

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, hereby incorporated by reference.

located in the Jurisdiction District of Columbia, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, hereby incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. §§ 2239B and 1956 | (Providing Material Support or Resources to Designated Foreign Terrorist Organizations), (Money Laundering) |

The application is based on these facts:

See Affidavit in Support of the Application for Search Warrant

- ☐ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* ________ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

[redacted]

*Applicant's signature*

[redacted] Special Agent

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone *(specify reliable electronic means)*.

Date: 08/18/2026



*Judge's signature*

City and state: Washington, D.C.

Matthew J. Sharbaugh, U.S. Magistrate Judge

*Printed name and title*

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means ☑ Original ❐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

District of Columbia

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

INFORMATION ASSOCIATED WITH A SERVER HELD BY AN INTERNET SERVICE PROVIDER PURSUANT TO 18 U.S.C. § 2703

Case No. 26-sc-1760

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the Jurisdiction of the District of Columbia *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, hereby incorporated by reference.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B, hereby incorporated by reference.

**YOU ARE COMMANDED** to execute this warrant on or before September 1, 2026 *(not to exceed 14 days)*

❐ in the daytime 6:00 a.m. to 10:00 p.m. ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to Matthew J. Sharbaugh, U.S. Magistrate Judge
*(United States Magistrate Judge)*

❐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❐ for ______ days *(not to exceed 30)* ❐ until, the facts justifying, the later specific date of ______________ .

Date and time issued: 08/18/2026

*Judge's signature*

City and state: Washington, D.C.

Matthew J. Sharbaugh, U.S. Magistrate Judge
*Printed name and title*

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

**Return**

| Case No.: 26-sc-1760 | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: ____________________

____________________
*Executing officer's signature*

____________________
*Printed name and title*

**ATTACHMENT A**

***Property to be searched***

This warrant applies to records and information associated with

a. **45.134.141.68**

(the "**SUBJECT SERVER"**), and any other information, data, and records stored on a server that is stored at premises owned, maintained, controlled, or operated by DataCamp Limted ("DataCamp"), [redacted] DataCamp is headquarted in London, United Kingdom at 9 Coldbath Square.

# ATTACHMENT B

## Particular Things to be Seized

### I. Information to be disclosed by DataCamp Limited ("DataCamp" or "PROVIDER")

To the extent that the information described in Attachment A is within the possession, custody, or control of DataCamp, regardless of whether such information is located within or outside of the United States, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the PROVIDER is required to disclose the following information to the government for the **SUBJECT SERVER** or related identifiers or accounts listed in Attachment A from when the **SUBJECT SERVER** was first associated with DataCamp's services to the present:

a. The contents of any available messages that are or were stored in the account or servers associated with the **SUBJECT SERVER** or in any folder created by the user of the account, as well as all messages in storage under, or associated with, any preservation numbers associated with the **SUBJECT SERVER** or any account associated with the **SUBJECT SERVER**, including all draft messages, sent messages, unsent messages, received messages, and deleted messages (including, but not limited to, emails, posts, messages, discussions, photographs, videos, recordings, images, or communications of any kind).

b. All available header information for all messages sent and received by the account from when the **SUBJECT SERVER** was first associated with DataCamp's services.

c. The contents of all records associated with the **SUBJECT SERVER** or any account associated with the **SUBJECT SERVER**.

d. All records or other information regarding the identification of the account, to include full name(s), physical address(es), telephone number(s), other identifiers, log-in credentials,

profile for the user(s), records of session times and durations, the date on which the account was created, the length of service, the types of all account services utilized or linked to the account, the IP address used to register the account, all IP addresses (including intrasession IP addresses) associated with session times, account status, alternative email address(es) provided during registration, methods of connecting, log files, and means and sources of payment (including any credit or bank account number).

e. All records or other information stored by an individual using the account, including address books, contact and buddy lists, and profile pictures.

f. All records pertaining to communications between DataCamp and any person regarding the account, including contacts with support services and records of actions taken.

g. All financial records, receipts and payments related to the **SUBJECT SERVER**, including payment information, receipts, invoices, correspondence, credit card information, identification information, and cryptocurrency addresses and wallets.

h. All records pertaining to devices associated with the **SUBJECT SERVER**, accounts affiliated with the **SUBJECT SERVER**, and software used to create and access the account, including device serial numbers, instrument numbers, model types/numbers, International Mobile Equipment Identities ("IMEI"), Mobile Equipment Identifiers ("MEID"), Global Unique Identifiers ("GUID"), Electronic Serial Numbers ("ESN"), Android Device IDs, phone numbers, Media Access Control ("MAC") addresses, operating system information, browser information, mobile network information, information regarding cookies and similar technologies, and any other unique identifiers that would assist in identifying any such device(s).

i. All accounts linked by device serial numbers, instrument numbers, model types/numbers, International Mobile Equipment Identities ("IMEI"), Mobile Equipment Identifiers ("MEID"), Global Unique Identifiers ("GUID"), Electronic Serial Numbers ("ESN"), Android Device IDs, phone numbers, Media Access Control ("MAC") addresses, operating system information, browser information, mobile network information, cookie or similar technologies, and any other unique identifiers to the **SUBJECT SERVER** or the account or accounts that linked the **SUBJECT SERVER** to DataCamp's services

Within seven days of the issuance of this warrant, PROVIDER shall deliver the information set forth above via U.S. mail, courier, or e-mail to the following:.

[redacted]

**II. Information to be seized by the government**

All information described above in Section I that constitutes fruits, contraband, evidence, and/or instrumentalities of violations of 18 U.S.C. §§ 2239B and 1956, as described in the affidavit in support of this warrant, or that may help identify or locate the perpetrator(s) thereof, including information pertaining to the following matters:

a. Evidence of communications to or from a foreign terrorist organization, including any information relevant to planning, activities, persons providing support to a foreign terrorist organization, and acts of violence;

b. Information related to revenue generated for, or on behalf of, a foreign terrorist organization and records pertaining to the movement of those funds;

c. Evidence the **SUBJECT SERVER** or user(s) of the **SUBJECT SERVER** associated with or acted on behalf of a foreign terrorist organization;

d. Records pertaining to the use of, control over, and ownership of the **SUBJECT SERVER**;

e. Evidence indicating how and when the **SUBJECT SERVER** was accessed or used, to determine the chronological and geographic context of account access, use and events relating to the crime under investigation and the **SUBJECT SERVER**'s subscriber;

f. Any records pertaining to the means and source of payment for services (including any credit card or bank account number or digital money transfer account information);

g. Evidence indicating the subscriber's state of mind as it relates to the crime under investigation or evidence indicating co-conspirators states of mind as it relates to the crime under investigation;

h. Evidence that may identify any co-conspirators or aiders and abettors, including records that help reveal their whereabouts.

i. Information that constitutes evidence of the identification and location of the user(s) of the **SUBJECT SERVER**;

j. Any and all communications involving financial transactions, including transfer, possession, purchase, exchange, and distribution of assets, property, cryptocurrency, currency, or other items of value;

k. All communications with persons who were involved in transactions involving a foreign terrorist organization or persons working with, or assisting, such organizations;

l. Any communications, documents or information related to U.S. or international sanctions, including those against Iran and foreign terrorist organizations;

m. Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) in providing material support to a terrorist organization; or (ii) communicated with the **SUBJECT SERVER** about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;

n. All financial records, including account information, payments, invoices, receipts, ledgers, logs, and data that relate to the transfer of assets, property, or other material, to include virtual wallets, passwords, seed phrases, account information, back-up information, cryptocurrency keys, codes, addresses, two factor authentication material, and payment methods;

o. Any documents or information related to false statements, the deletion, destruction, or removal of documents, information or records related to financial transactions;

p. Recorded communications, including voicemail, audio files and video, related to the crimes under investigation, including cryptocurrency transactions;

q. Documents, ledgers, payments, receipts and other documents related to the issuance of loans, wire transactions, authorizations, and instructions related to any financial transactions, including those involving potential front companies or persons;

r. Information that constitutes evidence indicating the identity of the **SUBJECT SERVER's** user, to include IP addresses, know your customer evidence, identification materials, documents, passport photos, and other information that could assist in identifying the user of the accounts;

s. Information that constitutes evidence concerning how and when the **SUBJECT SERVER** was accessed or used, to determine the geographic and chronological context of the

access, use, and events relating to the crime under investigation and to the **SUBJECT SERVER**'s user; and

t. Information and communications with persons who are working with, or associated with, a foreign terrorist organization, to include any material, information, image, or location showing or establishing:

a. transmitting, or receiving virtual currency addresses;
b. Financial and/or banking information used in furtherance of financing or money laundering activity;
c. transfer of funds;
d. online accounts, bank accounts, user profiles, telephone numbers, or email address for donors, co-conspirators, or accomplices;
e. Preparatory steps taken in furtherance of the scheme to facilitate terrorist financing or money laundering;
f. an effort to conceal monetary transactions or obfuscate the true identity of the donors or recipients of funds;

u. When the **SUBJECT SERVER** was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crimes under investigation and to the email account owner; Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly), or aided and abetted the commission of the criminal activity under investigation; or (ii) communicated with the account about matters relating to the criminal activity under investigation, including records that help identify any of the foregoing persons or reveal their location and whereabouts; and

v. IP Logs, passwords, geo-locational information or other records that will help establish and link online accounts to an end user or to computers and electronic devices used and the location of those users or devices.

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

**CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS RECORDS PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11)**

I, ________________________________, attest, under penalties of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this declaration is true and correct. I am employed by DataCamp, and my official title is ____________________________. I am a custodian of records for DataCamp. I state that each of the records attached hereto is the original record or a true duplicate of the original record in the custody of DataCamp, and that I am the custodian of the attached records consisting of __________ (pages/CDs/kilobytes). I further state that:

a. all records attached to this certificate were made at or near the time of the occurrence of the matter set forth, by, or from information transmitted by, a person with knowledge of those matters;

b. such records were kept in the ordinary course of a regularly conducted business activity of Google.; and

c. such records were made by DataCamp as a regular practice.

I further state that this certification is intended to satisfy Rule 902(11) of the Federal Rules of Evidence.

________________________ ____________________________________________

Date Signature

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH A SERVER HELD BY AN INTERNET SERVICE PROVIDER PURSUANT TO 18 U.S.C. § 2703** | **Case No. 26-sc-1760**<br><br>**Filed Under Seal** |

***Reference: USAO Ref. #2025R00808: Subject Account(s): 45.134.141.68***

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT**

I [redacted] being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant for information associated with a server supporting the website alqassam.ps with the IP address 45.134.141.68 (**SERVER 68**) further described below and in Attachment A. Known and unknown actors use **SERVER 68** to support a cryptocurrency donation scheme to generate revenue for HAMAS, which is a designated Foreign Terrorist Organization ("FTO"). An electronic service provider named DataCamp Limited ("DataCamp") controls **SERVER 68**. DataCamp is headquartered in London, United Kingdom at 9 Coldbath Square. DataCamp also operates a brand known as "DataPacket." DataCamp and DataPacket provide electronic services through servers located in the United States, the United Kingdom and other countries, including Brazil.

2. The information to be searched is described in the following paragraphs and in Attachments A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require DataCamp to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment

B, government-authorized persons will review that information to locate the items described in Section II of the Attachment B.[1]

3. I am a "federal law enforcement officer" within the meaning of the Federal Rule of Criminal Procedure 41(a)(2)(c), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

3. I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been since September 2022. While employed by the FBI, I have investigated federal criminal violations related to high technology or cybercrime, including violations of 18 U.S.C. § 1343 (Wire Fraud) and 18 U.S.C. § 1030 (Fraud and Related Activities in Connection with Computers). I have gained experience through training and everyday work relating to conducting these types of investigations. Prior to becoming a special agent of the FBI, I earned a bachelor's degree in history, a master's degree in criminal justice, and served more than seven years as a communications officer in the United States Marine Corps. I have received training related to computer networking, virtual currency, and cyber security.

4. Specifically, I have completed the FBI's Accelerated Cyber Training Program. I am licensed to trace virtual currency via a Blockchain Analysis Software that has provided reliable

[1] The Government intends to serve this warrant as a certified order pursuant to the Agreement between the Government of the United States and the Government of the United Kingdom of Great Britain and Northern Ireland on Access to Electronic Data for the Purpose of Countering Serious Crime, also known as the U.S.-UK CLOUD Act Agreement ("the Agreement"). The purpose of the Agreement is to resolve potential conflicts of legal obligations when communications service providers are served with legal process from one party for the production of data covered by the Agreement, where those providers may also be subject to the laws of the other Party. The law of the United Kingdom permits the Provider to comply with certified orders subject to the Agreement. The Department of Justice, Criminal Division, Office of International Affairs ("OIA"), is the U.S. Designated Authority pursuant to the Agreement. OIA will transmit the warrant to the Provider along with a certification that the warrant complies with the terms of the Agreement, as well as instructions on how to comply with the warrant.

information in the past. I am one of only two agents in the FBI Albuquerque Field Office licensed to trace virtual currency. I have obtained a Global Information Assurance Certification in Security Essentials and also a certification on using Open Source Intelligence investigative methods.

5. In addition to my direct experience, I have also had conversations with cyber investigators across the FBI regarding dozens of complex cases, including several involving virtual currency account and bank account seizures. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, analysts, witnesses, and agencies. This affidavit is intended to show that there is sufficient probable cause for the requested search warrant. It does not set forth all of my knowledge, or the knowledge of others, about this matter.

6. This matter has been the subject of prior search and seizure warrants issued by this Court in 2025, including 25-sc-765 issued by the Honorable G. Michael Harvey, 25-sz-20 issued by Judge Matthrew Sharbaugh, and 25-zs-42 and 25-sz-34 by the Honorable Moxila Uphadhyaya. Paragraphs 10-47 of this warrant are substantially similar to the content of the Affidavits presented in support of those prior warrants. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 2339B (Providing Material Support or Resources to Designated Foreign Terrorist Organizations) and 18 U.S.C. § 1956 (Money Laundering) (the "Subject Offenses") were committed by conspirators controlling **SERVER 68 –** which is registered via DataCamp. As set forth below, there is also probable cause to search the information described in Attachment A for evidence of the crimes further described in Attachment B.

**JURISDICTION**

7. This Court has jurisdiction to issue the requested warrant because it is a "court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). As discussed more fully below, the criminal offenses under investigation began or were committed upon the high seas, or elsewhere out of the jurisdiction of any particular State or district, and no offender is known to have, or have had, residence within any United States district. *See* 18 U.S.C. § 3238. One or more of the criminal statutes under investigation, 18 U.S.C. §2339B, applies extraterritorially.

**SUBSTANTIVE CRIMINAL OFFENSES**

6. Providing Material Support or Resources to Designated Foreign Terrorist Organizations. This investigation relates to the provision of material support to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B.

7. 18 U.S.C. § 2239B(a)(1) provides, "Whoever knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be fined under this title or imprisoned not more than 20 years, or both." "[M]aterial support or resources" is defined as

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

18 U.S.C. §§ 2339A(b)(1), 2339B(g)(4).

8. Money Laundering. 18 U.S.C. § 1956(a)(1)(B)(i) makes it a crime to conduct or attempt to conduct a financial transaction, knowing that the property involved in the transaction represents the proceeds of some form of unlawful activity, and which in fact involves the proceeds

of specified unlawful activity, knowing that the transaction is designed in whole or in part to conceal the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity. This activity is commonly referred to as concealment money laundering.

9. The money laundering statute, 18 U.S.C. § 1956, also makes it a crime to conspire to engage in money laundering: "Any person who conspires to commit any offense defined in [section 1956] or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy." 18 U.S.C. § 1956(h).

## DEFINITIONS

10. **Virtual Currency**: Virtual currencies are digital tokens of value circulated over the Internet. Virtual currencies are typically not issued by any government or bank like traditional fiat currencies, such as the U.S. dollar, but rather are generated and controlled through computer software. Different virtual currencies operate on different blockchains, and there are many different, widely used virtual currencies currently in circulation. Bitcoin (or BTC) and ether (ETH) are currently the most well-known virtual currencies in use. BTC exists on the Bitcoin blockchain and ETH exists on the Ethereum network. Typically, a virtual currency that is "native" to a particular blockchain cannot be used on a different blockchain. Thus, absent technological solutions those native assets are siloed within a specific blockchain. For instance, ETH (the native token on the Ethereum network) cannot be used on other networks unless it is "wrapped" by smart contract code. This wrapping process results in what is called Wrapped ETH or WETH.

11. **Blockchain**: Many virtual currencies publicly record all of their transactions on what is known as a blockchain. The blockchain is essentially a distributed public ledger, run by

the decentralized network of computers, containing an immutable and historical record of every transaction utilizing that blockchain's technology. The blockchain can be updated multiple times per hour and records every virtual currency address that has ever received that virtual currency and maintains records of every transaction and all the known balances for each virtual currency address. There are different blockchains for different types of virtual currencies.

12. **Blockchain Explorer**: These explorers are online tools that operate as a blockchain search engine allowing users the ability to search for and review transactional data for any address on a particular blockchain. A blockchain explorer is software that uses application programming interface and blockchain nodes to draw data from a blockchain and uses a database to arrange and present the data to a user in a searchable format.

13. **Smart Contract:** Smart contracts are computer programs stored on a blockchain that run when predetermined conditions are met. Typically, they are used to automate the execution of an agreement so that all participants can be immediately certain of the outcome, without any intermediary's involvement. The Ethereum network is designed and functions based on smart contracts.

14. **Stablecoins**: Stablecoins are a type of virtual currency whose value is pegged to a commodity's price, such as gold, or to a fiat currency, such as the U.S. dollar, or to a different virtual currency. Stablecoins achieve their price stability via collateralizations (backing) or through algorithmic mechanisms of buying and selling the reference asset or its derivatives.

15. **Tether (USDT)**: Tether ("USDT") is a virtual currency that resides on multiple blockchains. The value of USDT is tied to the value of the U.S. dollar; therefore, one unit of USDT is represented to be backed by one U.S. dollar in Tether Limited's reserves, making it what is known as a "stablecoin." USDT is hosted on the Ethereum and Tron blockchains, among others.

USDT is issued by Tether Limited, a company that controls the smart contracts and treasury for USDT, which is domiciled in the British Virgin Islands. Because Tether manages the smart contracts for USDT, it can blacklist addresses containing USDT.

16. **Tron (TRX)**: Tron is a blockchain network built to host decentralized applications with high speed, scalability and low fees. TRX is the native token used to power the network. TRC20 is a network protocol used for smart contracts, often enabling USDT transfers via the Tron blockchain.

17. **Virtual Currency Address**: Virtual currency addresses are the particular virtual locations to which such currencies are sent and received. A virtual currency address is analogous to a bank account number and is represented as a string of letters and numbers.

18. **Private Key**: Each virtual currency address is controlled through the use of a unique corresponding private key, a cryptographic equivalent of a password, which is needed to access the address. Only the holder of an address's private key can authorize a transfer of virtual currency from that address to another address.

19. **Virtual Currency Wallet**: There are various types of virtual currency wallets, including software wallets, hardware wallets, and paper wallets. A virtual currency wallet allows users to store, send, and receive virtual currencies. A virtual currency wallet can hold many virtual currency addresses at the same time.

20. Wallets that are hosted by third parties are referred to as "hosted wallets" because the third party retains a customer's funds until the customer is ready to transact with those funds. Conversely, wallets that allow users to exercise total, independent control over their funds are often called "unhosted" wallets.

21. **<u>Virtual Currency Bridge</u>**: A blockchain bridge, otherwise known as a cross-chain bridge, connects two blockchains and allows users to send virtual currency from one chain to the other.

22. **<u>Virtual Currency Exchanges (VCEs)</u>**: VCEs are trading and/or storage platforms for virtual currencies, such as BTC and ETH. There are generally two types of VCEs: centralized exchanges and decentralized exchanges, which are also known as "DEXs." Many VCEs also store their customers' virtual currency in virtual currency wallets. As previously stated, these wallets can hold multiple virtual currency addresses associated with a user on a VCE's network. Because VCEs act as money services businesses, they are legally required to conduct due diligence of their customers (i.e., KYC checks) and to have anti-money laundering programs in place (to the extent they operate and service customers in the United States).

23. **<u>Blockchain Analysis</u>**: As previously stated, while the identity of a virtual currency address owner is generally anonymous, law enforcement can identify the owner of a particular virtual currency address by analyzing the blockchain (*e.g.*, the Bitcoin blockchain). The analysis can also reveal additional addresses controlled by the same individual or entity. "For example, when an organization creates multiple [BTC] addresses, it will often combine its [BTC] addresses into a separate, central [BTC] address (*i.e.*, a "cluster"). It is possible to identify a 'cluster' of [BTC] addresses held by one organization by analyzing the [BTC] blockchain's transaction history. Open source tools and private software products can be used to analyze a transaction." *United States v. Gratkowski*, 964 F.3d 307, 309 (5th Cir. 2020).

24. In addition to using publicly-available blockchain explorers, law enforcement uses commercial services offered by several different blockchain-analysis companies to investigate virtual currency transactions. These companies analyze virtual currency blockchains and attempt

to identify the individuals or groups involved in transactions. Through numerous unrelated investigations, law enforcement has found the information provided by these tools to be reliable.

25. **Decentralized Finance (DeFi)**: Decentralized Finance, or DeFi, is an umbrella term for financial services on public blockchains, primarily the Ethereum network. The Ethereum network's native virtual currency is ETH. Ethereum was the first blockchain that offered various decentralized services within its network. To make these services possible, the Ethereum network allows other tokens besides ETH to run within the network. These tokens are known as ERC-20 tokens.

26. DeFi is a term used to describe a financial system that operates without the need for traditional, centralized intermediaries. Instead, DeFi platforms offer an alternative financial system that is open for anyone to use, and that allows centralized intermediaries to be replaced by decentralized applications (or dApps). With DeFi, one can do most of the things that banks support—earn interest, borrow, lend, buy insurance, trade derivatives, trade assets, etc.—but it is faster than using traditional banks and does not require paperwork or a third party. DeFi is global, peer-to-peer (*i.e.*, directly between two people rather than routed through a centralized system), pseudonymous, and open to the public.

27. **Recovery Address:** In the context of email accounts, a "recovery address" is an email account address which is provided by the subscriber at the time an email account is registered with a service provider. The recovery address is often used in the process of registration, during which the subscriber must access the recovery account and take some action in order to confirm their control of the address. In the event that an email account becomes locked or the password is forgotten, the recovery address is often used as a means to regain access to the email account. Because the recovery address is known to the subscriber at the time of registration for an email

account, and often used in the process of confirming the registration of the email account, and because the recovery account can be used to gain control of an email account, the person who controls the recovery account is typically the same person who controls the email account. Therefore, it is reasonable to assume that if several accounts have the same recovery address, they likely belong to the same person or persons.

## BACKGROUND OF THE INVESTIGATION

### I. HAMAS and the al-Qassam Brigades

28. Harakat al-Muqawamah al-Islamiyya, commonly known as HAMAS, was founded in 1987 as an outgrowth of the Palestinian branch of the Muslim Brotherhood. From its inception, HAMAS's stated purpose has been to create an Islamic Palestinian state throughout Israel by eliminating the State of Israel through violent holy war, or jihad. HAMAS has not only directed its violence and terrorism against Israeli targets in furtherance of that goal; HAMAS's leaders have also assailed the United States and American citizens, in retaliation for and in an effort to weaken American support for Israel's right to exist and defense of that right. HAMAS has murdered and injured dozens of Americans as part of its campaign of violence and terror.

29. HAMAS carries out terrorist attacks and armed conflict through the Izz al-Din al-Qassam Brigades (the "al-Qassam Brigades"), its military wing. The al-Qassam Brigades conduct suicide bombings and other terrorist attacks within Israel, Gaza, and the West Bank, and have done so for decades. These attacks have included large-scale bombings against Israeli civilian targets, small-arms attacks, improvised roadside explosives, and rocket attacks.

30. On October 8, 1997, the United States Secretary of State designated HAMAS as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act. On October 31, 2001, the Secretary of State also designated HAMAS as a Specially

Designated Global Terrorist Organization under Executive Order 13224. The Secretary of State has also listed the following aliases for HAMAS: Islamic Resistance Movement, Harakat al-Muqawama al-Islamiya, Students of Ayyash, Students of the Engineer, Yahya Ayyash Units, Izz Al-Din Al-Qassim Brigades, Izz Al-Din Al-Qassim Forces, Izz Al-Din Al Qassim Battalions, Izz al-Din Al Qassam Brigades, Izz al-Din Al Qassam Forces, and Izz al-Din Al Qassam Battalions. To date, HAMAS remains a designated FTO.

**The October 7 HAMAS Attacks**

31. On or about October 7, 2023, HAMAS and other terrorist groups, including the Palestinian Islamic Jihad ("PIJ"), another designated FTO,2 launched a surprise assault into Israel ("the October 7 HAMAS Attacks"). HAMAS began by firing thousands of rockets, and then HAMAS militants crossed into Israel. The militants infiltrated Israeli towns and army bases and took civilian and soldier hostages, many of whom they brought back to Gaza. Israel formally declared war on HAMAS in response to the attack and began a ground invasion of the Gaza Strip on October 27, 2023. According to news reports, the HAMAS assault that began on or about October 7, 2023, killed approximately 1,200 people, including American citizens. HAMAS also took more than 250 people hostage, also including American citizens. HAMAS publicly took credit for the attacks.

32. In connection with the initiation of the October 7 HAMAS Attacks, on or about October 7, 2023, the now deceased supreme military commander of the al-Qassam Brigades,

[2] On October 8, 1997, the United States Secretary of State designated Palestine Islamic Jihad – Shaqaqi Faction as a Foreign Terrorist Organization under Section 219 of the Immigration and Nationality Act. On January 23, 1995, the Department of the Treasury also designated PIJ as a Specially Designated Terrorist under Executive Order 12947. The Secretary of State has also listed the following aliases for PIJ: PIJ-Shaqaqi Faction, PIJ, Islamic Jihad in Palestine, Abu Ghunaym Squad of the Hizballah Bayt Al-Maqdis, Al-Quds Squads, Al-Quds Brigades, Saraya Al-Quds, Al-Awdah Brigades.

Mohammed al-Masri, a/k/a "Mohammed Deif," a/k/a "al Khalid al-Deif," issued a recorded message in which he "announce[d] the 'Al-Aqsa Flood' operation," and identified himself as "commander-in-chief of the Brigades of the martyr Ezeddine al-Qassam."

33. Also on or about October 7, 2023, al-Masri stated in a message broadcast on al-Aqsa TV that the al-Qassam Brigades leadership had "decided to put an end to all the crimes of the occupation, and the time during which it was rampant without accountability has ended." He stated that in the first minutes of the October 7 attacks, HAMAS launched 5,000 missiles and artillery shells, and asserted that the "Al-Aqsa Flood" operation was launched in response to what al-Masri described as "crimes committed by the Israeli occupation and colonial settlers," and American and Western support for and international silence regarding the occupation. He also instructed, "Today, whoever has a weapon should pull it out, this is its time, and whoever has no weapon should get his axe, Molotov cocktail, his truck, his bulldozer, or his car."

34. On or about October 8, 2023, the day after the October 7 HAMAS Attacks had begun, Ali Baraka, HAMAS's head of National Relations Abroad who is effectively responsible for HAMAS's foreign relations,3 appeared in a video interview aired on a Russian television outlet. During the interview, Baraka conveyed that "[a] limited number of HAMAS leaders knew . . . about the attack and its timing." Baraka stated that HAMAS's social activities had actually been a ruse, to "make them [i.e., Israel and the international community] think that HAMAS was

[3] From 2011 to 2019, Baraka was HAMAS's representative in Lebanon. Baraka is based principally in Lebanon. On or about December 13, 2023, the U.S. Department of the Treasury, Office of Foreign Assets Control ("OFAC") designated Baraka as a Specially Designated Global Terrorist under Executive Order 13224. In announcing the designation, OFAC noted that, when he held the position of HAMAS's representative to Lebanon, Baraka "met with international diplomats based in Lebanon on behalf of Hamas and spoke in support of violent campaigns" and that "[a]ccording to [] Baraka's public statements, Hamas has long drawn on money and training from Iran and Iranian proxies like Hizballah while bolstering forces in Gaza."

busy with governing Gaza, and that it wanted to focus on the 2.5 million Palestinians" living there, when "[a]ll the while, under the table, HAMAS was preparing for this big attack." In fact, Baraka stated that HAMAS had "been preparing for this [i.e., the October 7 HAMAS Attacks] for two years." In response to a question about the hostages being held by HAMAS, Baraka stated, "There are also prisoners in the U.S. We want them. Of course. There are HAMAS members sentenced for life in the U.S. We want them too. Of course. We demand that the U.S. free our sons from prisons."

35. The October 7 HAMAS attacks marked the beginning of what has become the Israel-HAMAS war. A ceasefire agreement between Israel and HAMAS was reached on or about January 15, 2025, and went into effect on or about January 19, 2025. On or about March 18, 2025, the Israeli Prime Minister's Office released a statement indicating that he had authorized "the renewal of military action" against HAMAS.4

36. Between on or about October 7, 2023, and on or about February 26, 2025, numerous hostages taken by HAMAS have died in captivity or been released as part of a ceasefire deal with Israel.

37. The History of HAMAS Virtual Currency Financing

38. Beginning in or about early 2019, HAMAS, through the al-Qassam Brigades, tested virtual currency fundraising by soliciting donations on its Telegram channel before shifting to direct fundraising through its official websites: alqassam.net, alqassam.ps, and qassam.ps.5

[4] *See* https://www.gov.il/en/pages/event-statement180325.

[5] I know these to be official websites for the al-Qassam Brigades based on a previous investigation and subsequent United States Department of Justice announcement. *See* https://www.justice.gov/archives/opa/pr/global-disruption-three-terror-finance-cyber-enabled-campaigns.

39. The al-Qassam Brigades boasted that bitcoin donations were untraceable and would be used for violent causes. Their websites offered video instruction on how to anonymously make donations, in part by using unique bitcoin addresses generated for each individual donor. However, such donations were pseudoanonymous. Through leveraging blockchain analysis, federal authorities seized virtual currency accounts, while also covertly seizing and operating the infrastructure behind alqassam.net.6




<u>Above</u>: Bitcoin donation advertisement on alqassam.net

40. In April 2023, HAMAS announced that it would stop receiving funds via bitcoin due to donor safety concerns. Statements on the website then called for donations to continue through other means.

## PROBABLE CAUSE

---

6 Information obtained via the U.S. Department of Justice, *available at* https://www.justice.gov/archives/opa/pr/global-disruption-three-terror-finance-cyber-enabled-campaigns

**Finding Messaging and Donation Addresses**

41. In February 2025, FBI Albuquerque identified a terrorist financing network soliciting donations to the al-Qassam Brigades via virtual currency. On February 6, 2025, an FBI Confidential Human Source (hereinafter referred to as "CHS-1"), who is located in the United States and has provided reliable information in the past, alerted me to a Telegram post asking supporters to send an email to an address associated with the al-Qassam Brigades, fund[@]alqassam.ps, in order to donate.




<u>Above</u>: Post from the al-Qassam Brigades asking for support

42. Fund[@]alqassam.ps's email address is also posted at the bottom of the al-Qassam Brigades website, https://alqassam.ps/arabic/. I know this to be an official website for the al-

Qassam Brigades based on a previous investigation and subsequent United States Department of Justice announcement.[7]




Above: Contact information shown on alqassam.ps/arabic/

43. On February 10, 2025, CHS-1 emailed fund[@]alqassam.ps asking how the CHS could donate to the al-Qassam Brigades. Several hours later, CHS-1 received a response from fund[@]alqassam.ps in Arabic, roughly translated to the following:

> *In the name of Allah, the Most Gracious, the Most Merciful*
>
> *"Go forth, whether light or heavy, and strive with your wealth and your lives in the cause of Allah. That is better for you, if you only knew." [At-Tawbah: 41]*
>
> *Dear sister/s: May Allah protect and care for you*
>
> *Peace, mercy, and blessings of Allah be upon you,*
>
> *May Allah reward you for your keenness to perform the duty of support and assistance to your mujahid brothers in Gaza; and we ask Allah Almighty to accept from you your efforts and giving. If you do not have experience in dealing with digital currencies, you can seek the help of a friend inside or outside your country, or go to a money transfer office or exchange in your country that has digital currencies, and show only the wallet information from this message; To transfer the support amount to it; it is necessary not to inform the party that will undertake the transfer on your behalf of our identity; to preserve your security.*
>
> *Attached is the address and data of our current digital currency wallet; which is received from all other platforms:*

[7] Information obtained via the U.S. Department of Justice, *available at* https://www.justice.gov/archives/opa/pr/global-disruption-three-terror-finance-cyber-enabled-campaigns

*Current wallet address:*

*TSWL3euRjZWXiFJgzuV9tYAGiwShtPWkZK*

*Please make sure to copy only the letters without any spaces before and after the letters; and it is preferable to extract the address from the code below:*

*Network Type:*

*Trc20*

*Currency Type:*

*USDT*

*Important Notes:*
*1. You can notify us of the value of the support and donation amount upon completion of the transfer process; to follow up on the receipt, God willing.*

*2. The wallet address is changed periodically to preserve your safety; therefore, the address is only valid for one transfer and support process; therefore, it is necessary to communicate via this email for any other new transfer process.*

*3. It is preferable not to use the "BINANCE" platform to transfer support; and not to enter any data indicating our official name so that your wallet is not blocked and for your safety as well (entering any fictitious data as the recipient of the transfer); You can transfer through the application: trust wallet, RedotPay, OKX, Kast, BYBIT...*

*Note: "BINANCE" can be used to purchase currencies only, then use another application to complete the transfer process.*

*4. We hope to circulate the official email for support and donations to the Al-Qassam Brigades: fund[@]alqassam.ps and published on the official website of the Brigades https://alqassam.ps; with the necessity of alerting our honorable audience that our response to their messages may reach them in the "junk" or "spam" mailbox and not in the Inbox; due to our access restriction policies.*

*May Allah write you the reward and reward you with all good,*

*And we ask you to pray for your brothers in Gaza and Palestine*

44. Based on my training and experience, I know that terrorists and cyber criminals often look for ways to obfuscate their online activity. Per the above message, the al-Qassam Brigades recommend donors avoid sending funds directly from Binance accounts. I have conducted in-depth virtual currency investigations and know Binance to be a commonly used exchange for users across the globe. However, I also know Binance maintains Know-Your-Customer (KYC) requirements to prevent fraudulent or illicit activity. Based on my training and experience, I also know other solutions listed, including Trust Wallet and Bybit, are commonly utilized to obfuscate the identity of the sender. By recommending these transfer solutions, the al-Qassam Brigades are seeking to receive funding while still attempting to protect the identities of their donors. Furthermore, I know USDT is a stablecoin that is widely used around the globe for different purposes, including, among other things, to finance criminal activities; and TRC20 is often chosen as a network because of its fast transaction speeds and low fees.

45. The FBI conducted virtual currency tracing and blockchain analysis on the USDT address that CHS-1 identified, TSWL3euRjZWXiFJgzuV9tYAGiwShtPWkZK, hereinafter referred to as "Donation Address 1". Over the course of several months, I continued to investigate this network through similar methods, receiving different virtual currency addresses that multiple FBI sources collected to identify additional HAMAS donation addresses. Based on blockchain analysis, I assess that this financing network has been operating since October 2024, and received over $3,000,000 in donations through November, 2025. As recently as October, 2025, the fund[@]alqassam.ps email sent multiple FBI Confidential Human Sources emails with instructions on how to donate to the group.

46. On July 9, 2025, an Instagram post from an account "omar.chahid.56" showed a graphic appearing to represent a demolished tank, with hearts falling through a cell phone below

Arabic writing. Also included on either side of the graphic were fund[@]alqassam.ps and info[@]alqassam.ps.




Above: Screenshot of an Instagram post on Jul 9, 2025

Machine translation showed the above image to read:

> *We in the Qassam Brigades have received, and continue to receive, millions of messages of support, and even eagerness to fight alongside us, as well as requests to join and enlist in any possible effort against the enemy from all the peoples of our nation without exception.*
> *To contribute and support: fund[@]alqassam.ps*
> *Contact us via: info[@]alqassam.ps*

47. At the time, research on alqassam.ps showed the internet service provider associated with the domain's IP address to be Amnpardaz Soft Corporation, an internet service provider located in Tehran, Iran. Hamas leaders have repeatedly thanked Iran for its military and financial support for many years. Based on this information, it is reasonable to believe that Iranian support and internet infrastructure has enabled HAMAS to operate this financing network.

Additionally, hosting infrastructure in Iran allows HAMAS to protect it from being taken offline by a service provider linked to the U.S. or a U.S. ally.

48. Alqassam.ps is also included in official propaganda videos and photos for the al-Qassam Brigades:




<u>Above:</u> Al-Qassam imagery showing alqassam.ps in the banner

49. A release from the Palestinian Information Center claimed that al-Qassam's only website address is "alqassam.ps".[8] In your affiant's training and experience, this website is known to be affiliated with the al-Qassam Brigades, and any contact information posted on the website is controlled by the al-Qassam Brigades or affiliates of HAMAS. Furthermore, in your affiant's training and experience, responses from the SUBJECT SERVER are coming from members of the al-Qassam Brigades of affiliates of HAMAS.

**<u>Alqassam[.]ps Network Infrastructure</u>**

---

[8] Information obtained via the Palestinian Information Center, available at https://english.palinfo.com/o_post/QB-Our-only-website-address-is-alqassam-ps/

50. Based on recent WhoIs lookups, as of July 24, 2026, 216.106.177.172 ("Server 172") supported the domain alqassam[.]ps. However, previously, the alqassam[.]ps domain was supported by the IP address 216.152.156.133 ("Server 133"). Both Server 133 and Server 172 were owned b [redacted] an internet service provider with datacenters located in the United States. [redacted] nd Server 133 became associated with alqassam.ps on May 26, 2026. As noted earlier, the previous registrar for alqassam[.]ps was Amnpardaz Soft Corporation, an Iran-based internet service provider. Amnpardaz Soft Corporation was the previous registrar for alqassam[.]ps from January 24, 2024, until at least April 13, 2026. [redacted] esponded to a court order and confirmed that alqassam[.]ps was associated with Server 133. [redacted] further confirmed that the IP address 216.152.156.133 was assigned to a dedicated server, owned by [redacted] located in a data center in Atlanta, Georgia. [redacted] cords also confirmed that 216.152.156.133 was a static IP assigned to alqassam.ps [redacted]

[redacted]

[redacted]

[redacted]

53. On July 16, 2026, I conducted open-source research and found that the **SUBJECT SERVER** was still active and accessible. A machine translated screenshot of the "Contact Us" page on the **SUBJECT SERVER** showed the same contact information used to support the global terror financing campaign I am investigating. Furthermore, several Telegram channels were listed, including one that provides "Jihadist Insights".




<u>Above</u>: Screenshot of the "Contact Us" page on alqassam.ps (taken July 16, 2026)

[redacted]

[redacted]

[redacted]

[redacted]

58. On July 24, 2026, I conducted an updated WhoIs lookup search and found that the alqassam[.]ps domain resolved to the IP address 216.106.177.172 (“Server 172”).



Above: WhoIs lookup showing IP address 216.106.177.172 (Server 172) resolving to alqassam.ps

On July 25, 2026, I conducted Domain Name System ("DNS") lookups to confirm alqassam[.]ps resolved to Server 172. I found that the previously assigned IP address, 216.152.156.133, no longer resolved to any active domain. However, the IP address for Server 172 (216.106.177.172) did [redacted]

```
Non-authoritative answer:
Name:    alqassam.ps
Address:  216.106.177.172
```

[redacted] hus, HAMAS used Server 172 to promote a scheme designed to provide material support to a terrorist organization in violation of 18 U.S.C. § 2339B and HAMAS purchased Server 172 by moving money from outside the United States into or through the United States (*i.e.*, the payments to DataCamp to lease Server 172 for alqassam.ps). These actions violated 18 U.S.C. §§

2339B and 1956(a)(2)(A) (International Promotional Money Laundering) and mean that Server 172 was subject to civil seizure and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) and (b). As part of this scheme, HAMAS actors leveraged US-based networking infrastructure in order to bypass delivery restrictions and ensure information could reach supporters across the globe.

60. On July 30, 2026, the FBI served seizure warrant 26-sz-45, which was issued by this court, seizing the GTHost server (Server 172) hosting alqassam[.]ps.

**United States Operations Targeting AlQassam[.]ps**

61. On March 27, 2025, June 26, 2025, and October 15, 2025, investigators used information from multiple CHSs to identify, trace, and seize approximately $560,000 in virtual currency intended to support Hamas' Al Qassam Brigades. In conjunction with these seizures, the FBI's Albuquerque Field Office worked with CHSs to identify and seize the domains Alaqsaflood.org and Host.alaqsaflood.org – two domains used to operate the fundraising and communication functions of AlQassam[.]ps. These seizures occurred in conjunction with Server 172 – which the Al Qassam Brigades used to host and control content on AlQassam.ps. The FBI's capture of the domains and servers enabled it to obtain additional donations intended for Hamas. Using related sources and methods the FBI also obtained information for thousands of individuals who used or had been contact with the Al Qassam website and either donated or attempted to donate to the terrorist organization using cryptocurrency and other traditional means.

**SERVER 68 and DataCamp Limited**

62. On August 4, 2026, pursuant to legal process [redacted]rovided the FBI with records showing that the Al-Qassam Brigades terrorist financing campaign was supported by a server with IP address 45.134.141.68 ("**SERVER 68**"). WhoIs lookups, as of August 5, 2026,

showed that **SERVER 68** was geolocated to São Paulo, Brazil, but owned by DataCamp Limited, an internet service provider with datacenters located in the United States.

[redacted]

[redacted]

[redacted]

64. As noted earlier, from January 24, 2024 until at least April 13, 2026, the previous registrar for alqassam[.]ps was Amnpardaz Soft Corporation, an Iran-based internet service provider.

65. On August 6, 2026, I conducted open-source research using publicly available repositories, finding that SERVER 68 held certificates for csguard[.]ir.

**45.134.141.68** Regular View >_ Raw Data Timeline Whois

**General** Information

| | |
|---|---|
| Hostnames | **csguard.ir**<br>unn-45-134-141-68.**datapacket.com** |
| Domains | csguard.ir datapacket.com |
| Country | **Brazil** |
| City | **São Paulo** |
| Organization | **Datacamp Limited** |
| ISP | **Datacamp Limited** |
| ASN | **AS60068** |

```
X509v3 Subject Key Identifier:
    1C:19:64:C2:A6:9E:34:F9:1C:41:C4:A9:26:73:F2:BD:12:53:F4:A7
X509v3 Authority Key Identifier:
    BB:20:CA:47:0B:FE:D7:E5:9C:F9:8F:09:2A:A3:8C:37:45:B1:BC:D8
Authority Information Access:
    CA Issuers - URI:http://ye1.i.lencr.org/
X509v3 Subject Alternative Name:
    DNS:*.csguard.ir, DNS:csguard.ir
X509v3 Certificate Policies:
    Policy: 2.23.140.1.2.1
```

Above: Screenshots from publicly available repositories showing csguard[.]ir associated with **SERVER 68**

[redacted]

[redacted]

66. More open source database and internet communications research revealed that **SERVER 68** broadcasts Secure Sockets Layer (SSL) certificates for the alqassam[.]ps name server, csguard[.]ir. These certificates enable secure connections to the name server, which allows resolution of web tra[redacted]
Al-Qassam Brigade [redacted] ecause of this connection, in your affiant's training and experience, the funds to lease the server again originated outside of the United States. DataCamp maintains datacenters in the United States, among other countries, and is subject to U.S. jurisdiction.

67. Based on the investigation described above, I believe that the administrators of the **SERVER 68** are coordinating a terror financing campaign and soliciting material support for HAMAS, and using the **SERVER 68** to further that campaign. Through my training and experience, I know that global terrorist organizations frequently use electronic media to seek support, and that email is used to communicate with individuals who may not be physically co-located. I believe there may be additional information found in **SERVER 68** as to the identities of HAMAS administrators. I also believe the message traffic sent via the **SERVER 68** will show priorities, needs, or other funding streams used to benefit HAMAS. Therefore, I have probable cause to believe that **SERVER 68** is being used to facilitate the Subject Offenses and that the users

of the **SERVER 68** have engaged in violations of 18 U.S.C. §§ 2239B and 1956. Furthermore, I believe the contents of **SERVER 68** will contain evidence of those violations.

68. Because information related to material support may be ongoing, it is reasonable to search DataCamp's records for information associated with **SERVER 68** from its association with DataCamp's services to the present day. Information from the **SUBJECT SERVER's** first association with DataCamp's services is also necessary because they are more likely to contain information identifying the **SUBJECT SERVER**'s true ownership and records of testing activity, which may be critical evidence of how this communication network is controlled and operates.

## BACKGROUND CONCERING DATACAMP

## BACKGROUND CONCERNING DATACAMP'S SERVER

69. DataCamp is headquartered in the United Kingdom but provides electronic services in the United States and around the world.

70. From my training and experience, I know DataCamp provides remote computing (or "cloud computing") and web hosting services to its customers. Customers can access DataCamp's services remotely over the internet.

71. One of the services that DataCamp provides is remote access to a VPS. A VPS provides the same end-user experience as a physically discrete computer, but it is in fact the digital emulation of a physical computer that is "hosted" within a distinct physical server and a single discrete physical server can host multiple VPSs. VPSs, including the VPSs provided by DataCamp, come with virtual computer drives, a complete operating system and one or more IP addresses that can be configured by the customer. VPSs can perform the same functions that are performed by physically discrete computers – they can be used to operate websites, run word

processing programs, operate databases, store files, provide proxy services, or to launch a cyber-attack.

72. Although a single physical server can host multiple VPSs, each VPS functions independently from the other VPSs that are hosted on the same physical device, and each VPS is accessed, controlled, copied, and operated independently from other VPSs on the same device.

73. DataCamp's VPSs are located in commercial datacenters in the United States and abroad. However, as noted above, DataCamp's customers lease and remotely connect to DataCamp's VPSs. DataCamp's customers can enjoy full control over their VPSs' operations. They can customize, configure, and program their VPSs to send and receive information over the internet, and they can store content and other data based on the customers' specifications. As a result, DataCamp's VPSs and servers are likely to contain stored contents and electronic communications created or received by the customers leasing them. If the customer or subscriber does not delete a file, it can remain on DataCamp's VPSs or servers indefinitely. In fact, even if the customer deletes a file, evidence of that file may continue to be available to DataCamp for a certain period of time, for example until the relevant VPS is re-provisioned for use by a different customer.

74. DataCamp's subscribers can control a number of VPSs, and can quickly rotate the VPSs that are associated with their accounts. In some cases, DataCamp VPSs can even be used for a single day – or for a single operation. DataCamp's subscribers that lease access to multiple VPSs can transfer programs, files, and other information among the VPSs that they have leased access to, and they can transition their information to and from a given VPSs over the course of a particular day. Thus, while their information may continue to be associated with a single

DataCamp customer account, it can migrate among different provider VPSs that have different IP addresses.

75. Based on information available on DataCamp's website, Datacamp operates a global network spanning over six continents, with network topology providing connections to major transit providers. DataCamp operates a dedicated-server and content delivery network business under the brand names "CDN77" and "DataPacket". CDN77 provides content delivery network services, whereas DataPacket provides high-bandwidth dedicated servers. DataCamp's core business is renting server hardware and bandwidth to customers, rather than housing physical equipment owned by customers. The dedicated server model provides that DataCamp owns and physically maintains the servers in data centers, while the customers lease use of specific servers for a fee.

76. Based on information available from DataCamp's website, DataCamp and its subsidiary, DataPacket, provide bandwidth to customers through dedicated servers that they can lease out. DataCamp owns the physical server hardware and operates the data centers or spaces where the servers physically lie. Because of this, DataCamp necessarily retains administrative and physical access to that equipment, even when the customer leases a server for their exclusive use.

77. Based on my training and experience, I know that DataCamp allows subscribers to obtain accounts by registering on DataCamp's website. During the registration process, DataCamp asks subscribers to create a username and password, and to provide basic personal information such as a name, an e-mail address, alternate e-mail address for backup purposes, a phone number, and a means of payment.

78. In general, user-generated content that is written using, stored on, sent from, or sent to a DataCamp's account can be permanently stored in connection with that account, unless the

subscriber deletes the material. For example, if the subscriber does not delete a file that he or she has stored on DataCamp VPSs, the file can remain on DataCamp's systems indefinitely. Even if the subscriber deletes the file, it may continue to exist on DataCamp's systems for a certain period of time. Based on my training and experience, I know that evidence of who controlled, used, and/or created a DataCamp account may be found within such computer files and other information created or stored by the DataCamp subscriber. Based on my training and experience, I know that the types of data discussed above can include records and communications that constitute evidence of criminal activity.

79. Based on my training and experience, I know that providers such as DataCamp also collect and maintain information about their subscribers, including information about their use of DataCamp services. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. Providers such as DataCamp also commonly have records of the IP address used to register the account and the IP addresses associated with other logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which devices were used to access the relevant account.

80. Based on my training and experience, I know that providers such as DataCamp also collect information relating to the devices used to access a subscriber's account – such as laptop or desktop computers, cell phones, and tablet computers. Such devices can be identified in various ways. For example, some identifiers are assigned to a device by the manufacturer and relate to the specific machine or "hardware," some identifiers are assigned by a telephone carrier concerning a

particular user account for cellular data or voice services, and some identifiers are actually assigned by DataCamp in order to track what devices are using DataCamp's accounts and services. Examples of these identifiers can include unique application number, hardware model, operating system version, Global Unique Identifier ("GUID"), device serial number, mobile network information, telephone number, Media Access Control ("MAC") address, and International Mobile Equipment Identity ("IMEI"). Based on my training and experience, I know that such identifiers may constitute evidence of the crimes under investigation because they can be used (a) to find other DataCamp accounts created or accessed by the same device and likely belonging to the same user, (b) to find other types of accounts linked to the same device and user, and (c) to determine whether a particular device recovered during course of the investigation was used to access the DataCamp account.

81. Based on my training and experience, I know that providers such as DataCamp can use cookies and similar technologies to track users visiting DataCamp's webpages and using its products and services. As explained above, a cookie is a small file containing a string of characters that a website attempts to place onto a user's computer. When that computer visits again, the website will recognize the cookie and thereby identify the same user who visited before. This sort of technology can be used to track users across multiple websites and online services belonging to DataCamp. More sophisticated cookie technology can be used to identify users across devices and web browsers. From training and experience, I know that cookies and similar technology used by providers such as DataCamp may constitute evidence of the criminal activity under investigation. By linking various accounts, devices, and online activity to the same user or users, cookies and linked information can help identify who was using a DataCamp account and determine the scope of criminal activity.

82. Based on my training and experience, I know that DataCamp maintains records that can link different DataCamp accounts to one another, by virtue of common identifiers, such as common e-mail addresses, common telephone numbers, common device identifiers, common computer cookies, and common names or addresses, that can show a single person, or single group of persons, used multiple DataCamp accounts. Based on my training and experience, I also know that evidence concerning the identity of such linked accounts can be useful evidence in identifying the person or persons who have used a particular DataCamp account.

83. Based on my training and experience, I know that subscribers can communicate directly with DataCamp about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Providers such as DataCamp typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. Based on my training and experience, I know that dedicated servers can perform multiple functions. For example, one physical server can host a domain server, mail server, and storage server all on the same hardware device. Providers such as DataCamp may maintain records that include web traffic, email traffic, and stored files.

84. In summary, based on my training and experience in this context, I believe that the computers of DataCamp are likely to contain user-generated content such as stored electronic communications and files, as well as DataCamp -generated information about its subscribers and their use of DataCamp services and other online services. In my training and experience, all of that information may constitute evidence of the crimes under investigation because the information

can be used to identify the account's user or users. In fact, even if subscribers provide DataCamp with false information about their identities, that false information often nevertheless provides clues to their identities, locations, or illicit activities.

85. As explained above, information stored in connection with a DataCamp account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element of the offense, or, alternatively, to exclude the innocent from further suspicion. From my training and experience, I know that the information stored in connection with a DataCamp account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, program files, contacts lists, and other files (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by DataCamp can show how and when the account was accessed or used. For example, providers such as DataCamp typically log the IP addresses from which users access the account along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the DataCamp account access and use relating to the criminal activity under investigation. This geographic and timeline information may tend to either inculpate or exculpate the person who controlled, used, and/or created the account. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (e.g., location information integrated into an image or video sent via e-mail). Finally, stored electronic data may provide relevant insight into the user's state of mind as it relates to the offense under investigation. For example, information in the DataCamp account may indicate its user's motive and intent to

commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement).

86. Based on my training and experience, I know that evidence of who controlled, used, and/or created a DataCamp account may be found within the user-generated content created or stored by the DataCamp subscriber. This type of evidence includes, for example, personal correspondence, personal photographs, purchase receipts, contact information, travel itineraries, and other content that can be uniquely connected to a specific, identifiable person or group. In addition, based on my training and experience, I know that this type of user-generated content can provide crucial identification evidence, whether or not it was generated close in time to the offenses under investigation. This is true for at least two reasons. First, people that commit crimes involving electronic accounts (e.g., e-mail accounts) typically try to hide their identities, and many people are more disciplined in that regard right before (and right after) committing a particular crime. Second, earlier-generated content may be quite valuable, because criminals typically improve their tradecraft over time. That is to say, criminals typically learn how to better separate their personal activity from their criminal activity, and they typically become more disciplined about maintaining that separation, as they become more experienced – and, in many cases, if not most cases involving sophisticated actors, they more commonly make mistakes (i.e., using accounts or other computer infrastructure for both criminal and personal purposes) when they first create the relevant accounts (or first obtain particular devices or other infrastructure). Finally, because DataCamp accounts do not typically change hands on a frequent basis, identification evidence from one period can still be relevant to establishing the identity of the account user during a different, and even far removed, period of time.

## CONCLUSION

87. Based on the forgoing, I request that the Court issue the proposed search warrant because **SERVER 68** was likely used to facilitate the Subject Offenses, and records associated with **SERVER 68** are likely to contain evidence of the criminal activity under investigation.

88. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving the warrant on DataCamp. Because the warrant will be served on DataCamp, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

[redacted]
Special Agent
Federal Bureau of Investigation

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on August 18, 2026.

MATTHEW J. SHARBAUGH
UNITED STATES MAGISTRATE JUDGE